## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INN DWELLING, INC., | : |
| | : |
| Plaintiff, | : |
| | : CIVIL ACTION NO. |
| | : |
| v. | : |
| | : |
| WOMEN'S RADIO NETWORK, INC.; | : |
| NYC RADIO 1, INC.; | : |
| PR GLOBAL NEWS, INC.; | |
| MBAS CONSULTING GROUP, INC.; | : **COMPLAINT & JURY DEMAND** |
| WBG CONSULTING, INC.; | |
| JOHN DOES 1-100, | : |
| | |
| Defendants. | : |
| | : |

Plaintiff, Inn Dwelling, Inc., is a Pennsylvania nonprofit corporation that was defrauded out of more than $300,000 by Defendants Women's Radio Network, Inc.; NYC Radio 1, Inc.; PR Global News, Inc.; MBAS Consulting Group, Inc.; WBG Consulting Inc.; and John Does 1-100. For its Complaint against defendants to recover these funds, Plaintiff alleges as follows:

### PARTIES

1.      Plaintiff is a nonprofit corporation incorporated in Pennsylvania, with its principal place of operation at 109 East Price Street, Philadelphia, Pennsylvania, 19144.

2.      Defendant Women's Radio Network, Inc. ("WRN") is a corporation

established on May 13, 2014, under the laws of New York state. The principal address for this corporation is 640 Johnson Avenue, Suite 203, Bohemia, NY 11716.

   3.  Defendant NYC Radio 1, Inc. ("Radio 1") is a corporation established on May 13, 2014, under the laws of New York state. The principal address for this corporation is 640 Johnson Avenue, Suite 203, Bohemia, NY 11716.

   4.  Defendant PR Global News, Inc. ("Global News") is a corporation established on April 25, 2014, under the laws of New York state. The principal address for this corporation is 640 Johnson Avenue, Suite 203, Bohemia, NY 11716.

   5.  Defendant MBAS Consulting Group, Inc. ("MBAS") is a corporation established on October 23, 2014, under the laws of New York state. The principal address for this corporation is 1988 Seamens Neck Road, Seaford, NY 11783.

   6.  Defendant WBG Consulting, Inc., ("WBG") is a corporation established on April 6, 2015, under the laws of New York state. The principal address for this corporation is 1465 Northside Dr. Suite 218, Atlanta, GA 30318.

   7.  Plaintiff does not know the true names of the defendants sued herein as John Does 1-100 and, therefore, sues such defendants by such fictitious names. Plaintiffs will amend this Complaint to set forth the true names of such defendants when the same are learned.

## JURISDICTION AND VENUE

   8.  This court has jurisdiction of all claims in this action, pursuant to 28 U.S.C. § 1332. The plaintiff is a citizen of Pennsylvania. None of the defendants are citizens of this state or of any state of which the plaintiff is also a citizen. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

   9.  This Court also has subject matter jurisdiction, pursuant to 28 U.S.C. §

1331, over plaintiff's claims against defendants arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; the Electronic Funds Transfer Act ("EFTA") 15 U.S.C. § 1693; and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. §§ 6102, 6104, all claims arising under federal law.

10.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the plaintiff's state law claims, because those claims and the federal law claims form part of the same case or controversy and share a common nucleus of operative facts.

11.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is appropriate in this judicial district because a substantial part of the events giving rise to plaintiff's claims occurred in this district.  Specifically, as alleged in greater detail below, defendants' agents made telephone calls to a nonprofit corporation operating within this judicial district in connection with their scheme to defraud.

## STATEMENT OF THE CASE

12.      Plaintiff is a nonprofit corporation in Philadelphia, Pennsylvania, that, among other things, assists the impoverished to find and finance housing and education opportunities.

13.      During all times relevant to this Complaint, Brother Alfred Smith, a Catholic cleric and member of the Vincentian order, served as Inn Dwelling's Executive Director.

14.      WRN operates an internet radio station available over the internet at www.wrnw1.com.  WRN purports to be "a forum for women to empower each other," one that gives "women a voice online through our broadcasting channels.  Providing them the opportunity to educate listeners with the knowledge and skills they have developed to succeed and maintain

success within their chosen professions."

15.　　　WRN promises on its website that its "unique brand of marketing and promotion will help women build their online presence and bring business women from diverse backgrounds together to build a strong network of successful individuals."

16.　　　Beginning no later than July 2014, WRN's agents or employees, including individuals purporting to be named Stephen (or Steven) Jacobs and Keith Manson, began making unsolicited telephone calls to Brother Smith at Inn Dwelling's offices.

17.　　　During these telephone calls, WRN's agents or employees asked Brother Smith to participate in telephone interviews during which Brother Smith would answer questions concerning Inn Dwelling's work.

18.　　　WRN's agents or employees represented that a large number of people listened to WRN.  According to WRN's agents or employees, these listeners would hear the interview conducted with Brother Smith and would learn of the valuable charitable work that Inn Dwelling performs.

19.　　　WRN's agents or employees conducted a first interview with Brother Smith on July 14, 2014.  It is unknown whether this interview was actually broadcast via WRN's internet radio station.

20.　　　Following this interview, WRN agents or employees telephoned Brother Smith and stated that the ratings for this interview were exceedingly high and that the interview had generated an unprecedented level of listener interest.

21.　　　In multiple phone calls between July 2014 and April 2015, WRN agents or employees, including Jacobs, stated to Brother Smith that by advertising on WRN, including by participating in future interviews, Inn Dwelling would receive donations from listeners.

-4-

22.    For this to occur, however, Inn Dwelling was required to pay money as a "credit" against these future donations, according to the statements made by WRN's agents or employees. These same individuals also stated to Brother Smith that the payments Inn Dwelling made would keep Inn Dwelling eligible to receive a lifetime achievement award from WRN, which included a cash award.

23.    In multiple phone calls between July 2014 and April 2015, WRN agents or employees, including Jacobs, stated that any payments made would be returned to Inn Dwelling many times over in the form of listener contributions and/or through the lifetime achievement award Brother Smith and/or Inn Dwelling would receive from WRN.

24.    The representations made by WRN's agents or employees were false and misleading. These agents or employees knew that Inn Dwelling would not receive a lifetime achievement award, would not receive listener donations, and would not recover any of the money Inn Dwelling paid to WRN.

25.    Brother Smith agreed to make a limited number of payments to defendants because they had falsely promised to procure charitable contributions and promote Inn Dwelling.

26.    However, WRN and other defendants also made unauthorized charges to Inn Dwelling's credit card and unauthorized withdrawals from Inn Dwelling's checking account.

27.    Defendants made eight charges to Inn Dwelling's credit card on the following dates in the amounts listed, including as shown, four charges on October 25, 2014:

| Date | Defendant | Amount |
|------|-----------|--------|
| July 28, 2014 | Global News | $2,500.00 |
| August 25, 2014 | Global News | $5,000.00 |
| September 24, 2014 | Global News | $3,885.00 |

| October 25, 2014 | WRN | $3,885.00 |
|---|---|---|
| October 25, 2014 | Global News | $2,000.00 |
| October 25, 2014 | WRN | $2,485.00 |
| October 25, 2014 | WRN | $2,385.00 |
| April 29, 2015 | WRN | $4,885.00 |
| Total | | $27,025.00 |

28.     In August 2014, defendants began making unauthorized withdrawals from Inn Dwelling's checking account via remotely created check.

29.     A remotely created check, or demand draft, is an unsigned paper check. Rather than bearing the signature of the account holder, the remotely created check has a printed line which reads "authorized by drawer." The remotely created check includes the account holder's account number and the bank's routing number.

30.     Remotely created checks are well known to be used by fraudulent telemarketers to perpetrate consumer fraud. The attorneys general of 35 states, the District of Columbia, and American Samoa have called upon the Board of Governors of the Federal Reserve System to eliminate such drafts because they are so frequently used to perpetrate fraud. Further, the Federal Trade Commission is in the process of considering the elimination of remotely created checks as a form of electronic payment because of their connection with telemarketing and other frauds.

31.     Defendants made or attempted to make 45 withdrawals from Inn Dwelling's checking account via remotely created checks on the following dates in the amounts listed, including over $100,000 of withdrawals during March 2015 alone:

| Date of RCC | Defendant | Amount |
|---|---|---|
| August 26, 2014 | WRN | $4,895.00 |
| September 3, 2014 | WRN | $4,895.00 |
| September 25, 2014 | WRN | $2,885.00 |
| October 3, 2014 | WRN | $4,895.00 |
| October 15, 2014 | WRN | $4,895.00 |
| October 21, 2014 | WRN | $4,995.00 |
| October 27, 2014 | WRN | $3,500.00 |
| October 29, 2014 | WRN | $4,985.00 |
| November 3, 2014 | WRN | $5,885.00 |
| November 5, 2014 | WRN | $5,885.00 |
| November 10, 2014 | WRN | $6,885.00 |
| November 17, 2014 | WRN | $6,885.00 |
| December 4, 2014 | WRN | $6,885.00 |
| December 10, 2014 | WRN | $6,895.00 |
| December 17, 2014 | WRN | $6,895.00 |
| December 23, 2014 | WRN | $6,995.00 |
| December 29, 2014 | WRN | $2,995.00 |
| January 2, 2015 | WRN | $6,995.00 |
| January 6, 2015 | WRN | $6,995.00 |
| January 13, 2015 | WRN | $6,895.00 |
| January 16, 2015 | WRN | $6,995.00 |

| Date of RCC | Defendant | Amount |
|---|---|---|
| January 22, 2015 | WRN | $6,985.00 |
| January 26, 2015 | WRN | $4,885.00 |
| January 30, 2015 | WRN | $7,985.00 |
| February 4, 2015 | WRN | $4,485.00 |
| February 6, 2015 | WRN | $7,395.00 |
| February 11, 2015 | WRN | $4,885.00 |
| February 13, 2015 | WRN | $8,885.00 |
| February 17, 2015 | WRN | $4,885.00 |
| February 20, 2015 | WRN | $8,985.00 |
| February 25, 2015 | WRN | $5,985.00 |
| March 3, 2015 | WRN | $8,985.00 |
| March 4, 2015 | WRN | $5,895.00 |
| March 6, 2015 | WRN | $16,885.00 |
| March 10, 2015 | WRN | $11,885.00 |
| March 12, 2015 | WRN | $17,885.00 |
| March 18, 2015 | Radio 1 | $11,885.00 |
| March 19, 2015 | Radio 1 | $11,885.00 |
| March 23, 2015 | Radio 1 | $6,885.00 |
| March 26, 2015 | MBAS | $8,895.00 |
| March 30, 2015 | MBAS | $8,895.00 |
| April 7, 2015 | Global News | $12,170.00 |

| Date of RCC | Defendant | Amount |
|---|---|---|
| April 8, 2015 | Global News | $3,985.00 |
| April 13, 2015 | WBG | $5,895.00 |
| April 22, 2015 | WBG | $8,870.00 |
| Total | | $326,290.00 |

32.     The increase in fraudulent withdrawals in March 2015 caused Inn Dwelling's checking account to be overdrawn.  As a result, Inn Dwelling's bank did not pay one of the withdrawals listed in the preceding paragraph for $11,885.  Consequently, defendants, through their fraudulent scheme, stole a total of $314,405 from Inn Dwelling's account.

33.     Brother Smith did not provide any of the defendants with Inn Dwelling's checking account number or bank routing number.  It is unknown to Inn Dwelling how defendants came to possess this information.

34.     The vast majority of the withdrawals from Inn Dwelling's checking account and charges made to Inn Dwelling's credit card were made without the authorization or informed consent of Inn Dwelling or Brother Smith.  In the few instances where defendants did obtain Brother Smith's authorization for charges or withdrawals, this authorization was obtained through the use of fraudulent statements, as described above.

35.     Notwithstanding that defendants charged Inn Dwelling's credit card or made withdrawals from its checking account on 53 occasions, WRN conducted only five interviews with Brother Smith between July 2014 and February 2015.  It is unknown whether any of the interviews were actually recorded, and if so, whether those recordings were actually broadcast via WRN's internet radio station.

36.     For the vast majority of the 53 fraudulent transactions above, Brother Smith received neither an invoice nor a receipt.

37.     In a few instances, Brother Smith received an "invoice" or a hyperlink to an "invoice" from the email address invoice@wrnw1.com. Most of these emails were signed by an individual identifying herself as Marie Rose. In one case, the email was signed by an individual identified only as Virginia from the "Admissions Department," and in another, both Marie and a person named Joelle are named on the email.

38.     The "invoices" attached to or available through hyperlinks included in these emails reflected that they were sent to Brother Smith after money had already been taken from Inn Dwelling's account. Each of the invoices reflects a $0.00 balance due and states the date "payment" was made. Some are even marked "paid in full."

39.     The "invoices" state that defendants were being paid for services that were not provided. For example, an "invoice" dated September 3, 2014, states that WRN would put a picture of Brother Smith and an associate at WRN on "celebrity row," a seeming reference to pictures of victims that WRN places on its website. This invoice also promises a "Commercial with Dr. Bucker" [sic], a seeming reference to Dr. Joyce Buckner, a personality advertised on www.wrnw1.com. Brother Smith did not participate in a commercial with Dr. Buckner.

40.     Brother Smith received another nearly identical "invoice" from invoice@wrnw1.com on April 22, 2015. The only significant difference from the September 3, 2014 "invoice" is that the entity identified on the invoice is WBG, not WRN. This "invoice" purports to be a receipt for the purchase of "(1)  Radio Show(s) [sic] to be aired live on Iheart Radio (WRNW AM 1100)," "**Major Press Release," "**Customized Plaque – Religious Professional of the Year Award," "**Photo placed on Celebrity Row," "KC mention." This final

item appears to be a reference to the "KC After Dark" show, which according to

www.wrnw1.com, is a radio show featuring KC Armstrong, a personality who purportedly

appeared on the Howard Stern show. No defendant ever provided Brother Smith with a plaque

or press release or conducted a radio show with Brother Smith.

       41.    Brother Smith received one "invoice" from Global News, one from WBG

Consulting, and four from WRN.  Brother Smith had no contact with representatives of Radio 1

or MBAS, and did not receive any invoices or receipts from these entities.

       42.    Despite the repeated promises made by WRN's agents or employees, Inn

Dwelling has received no money from either WRN listeners or any of the defendants.  Instead,

Inn Dwelling was left on the brink of financial ruin by defendants' fraudulent and unauthorized

credit card charges and account withdrawals.

       43.    Defendants have neither acknowledged nor responded to Inn Dwelling's

demand for a return of all funds taken from Inn Dwelling's credit cards and checking accounts.

       44.    Upon information and belief, Jeffrey Burton is the President of WRN, and

an owner or employee of Global News.  In 2000, the Federal Trade Commission ("FTC") filed

suit against Burton and others in a case captioned *FTC v. World Interactive Gaming Corp.*, 9:98-

cv-5115-JS, claiming that he and his agents offered for sale convertible preferred stock in an

internet casino through telemarketing cold calls.  The FTC alleged that Burton's agents told

consumers that they were being given the opportunity to invest in a casino business that would

be as profitable as Microsoft, Netscape, and Yahoo.  It also alleged that Burton's agents

represented that the internet casino would generate over $500,000 in its first month of operations

and as much as $100 million in revenue in its first year.  The stock was offered for sale at

$5/share, but the FTC alleged that Burton's agent represented that the stock would be worth

about $40/share within a year. The FTC's complaint averred that investors were told that they could earn approximately $150,000 on a $10,000 investment within one year. In November 2000, the United States District Court for the Eastern District of New York entered a stipulated order of injunction against Burton prohibiting him from, *inter alia*, "Violating or assisting others in violating any provisions of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310 (as amended from time to time), including but not limited to: misrepresenting, directly or by implication '[a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability.' 16 C.F.R. § 310.3(a)(2)(vi)."[1]

45.    In 2003, the United States District Court for the Eastern District of New York, in a case captioned *SEC v. Universe Inc.*, 00-cv-3596, entered a default injunction against Burton forbidding him from, *inter alia*, making false statements or using fraudulent practices in the sale of securities.

46.    Upon information and belief, Michael Anzalone-Storchevoy is the Director of Operations of WRN, and the President and owner of MBAS. He resides at 1988 Seamens Neck Road, Seaford, NY 11783, which is the registered address for MBAS Consulting Group.

47.    Upon information and belief, Brett Anzalone-Storchevoy is an individual, and an employee of MBAS. He also resides at 1988 Seamens Neck Road, Seaford, NY 11783.

48.    Upon information and belief, Brett Anzalone-Storchevoy and Michael Anzalone-Storchevoy are married and the abbreviation MBAS in the name of defendant MBAS Consulting Group, Inc. stands for Michael and Brett Anzalone-Storchevoy.

---

[1] Under the FTC's regulations, an "investment opportunity" is defined as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(q).

## COUNT I
Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. §§ 1962, 1964

49.     Inn Dwelling realleges the above paragraphs as if fully restated herein.

50.     Each defendant is a "person" for purposes of RICO, because each defendant is, and was at all relevant times, an entity capable of holding legal or beneficial interest in property.

51.     The defendants, as well as others whose identities are not yet known, collectively form an "enterprise" under RICO, in that they are a group of individuals and partnerships associated in fact, although not a legal entity.

52.     From at least July 2014 to April 2015, the enterprise was an ongoing, informal organization whose various associates functioned as a continuing unit for the shared purpose of fraudulently obtaining money for the public through the guise of an advertising and media relations  services program, which served as a cover for defendants' illegal scheme.

53.     The enterprise had an identifiable structure through which each Defendant conducted, or participated in the conduct of, the enterprise's affairs.  Upon information and belief, Michael Anzalone-Storchevoy and Jeffrey Burton controlled and directed the affairs of the enterprise on an ongoing basis through their positions at the WRN, Radio 1, Global News, MBAS, and WBG.

54.     Each of the entities were an essential element in a common fraudulent enterprise whereby WRN telemarketers obtained Inn Dwelling's credit card number and/or checking account and bank routing number with the intent to defraud.

55.     Defendants' conduct, and the conduct of other members of the enterprise, injured plaintiffs by perpetrating fraud that resulted in substantial losses to the

-13-

plaintiff. Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1).

56.     Racketeering activity includes violations of 18 U.S.C. § 1029. *See* 18 U.S.C. § 1961(1)(B).

57.     The account numbers and bank routing information deceptively obtained by the defendants are "access devices" as that term is defined in 18 U.S.C. § 1029(e)(1). Those access devices were obtained by the defendants with intent to defraud as alleged above. They were, therefore, "unauthorized access devices" as defined in 18 U.S.C. § 1029(e)(3).

58.     Defendants knowingly, and with the intent to defraud, used the unauthorized access devices and obtained more than $1,000 in money during a one-year period, in violation of 18 U.S.C. § 1029(a)(2).

59.     Racketeering activity also includes violations of 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1)(B).

60.     Defendants executed their scheme to defraud and obtain money by placing interstate phone calls to plaintiff and by making unauthorized withdrawals from plaintiff's checking by means of signals transmitted by wires in interstate commerce, in violation of 18 U.S.C. § 1343.

61.     The defendants, through their fraudulent activities, have engaged in, and their activities have affected, interstate commerce.

## COUNT II

-14-

Violations of the Electronic Fund Transfer Act
("EFTA"), 15 U.S.C. § 1693 *et seq.*

62.     Plaintiff realleges the above paragraphs as if fully restated herein.

63.     The purpose of the EFTA is "to provide a basic framework establishing

the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15

U.S.C. § 1693(b). The primary objective of the EFTA "is the provision of individual consumer

rights." *Id.*

64.     The EFTA provides that "[a] preauthorized electronic fund transfer from a

consumer's account may be authorized by the consumer only in writing, and a copy of such

authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). "In the case

of preauthorized transfers from a consumer's account to the same person which may vary in

amount, the ... designated payee shall, prior to each transfer, provide reasonable advance notice

to the consumer, in accordance with the regulations of the Board, of the amount to be transferred

and the scheduled date of the transfer." 15 U.S.C. § 1693e(b).

65.     Defendants engaged in "unauthorized electronic fund transfers," as that

term is defined in 15 U.S.C. § 1693a(11), by charging Inn Dwelling's credit cards and removing

money from Inn Dwelling's checking account without the Plaintiff's prior written authorization.

As alleged above, defendants failed to comply with their duties under the EFTA because they

initiated electronic fund transfers from plaintiff's accounts without obtaining authorization in

writing.

### COUNT III
Telemarketing and Consumer Fraud and Abuse Prevention Act
("TCFAPA"), 15 U.S.C. §§ 6102 and 6104

66.     Plaintiff realleges the above paragraphs as if fully restated herein.

67.     The TCFAPA, 15 U.S.C. §§ 6101 – 08, authorizes individuals to bring

private actions for violations of the statute or rules promulgated by the Federal Trade Commission ("FTC") implementing the act under the authority conferred in 15 U.S.C. § 6102.

68.     The FTC has adopted regulations known as the Telemarketing Sales Rule ("TSR") in Title 16 of the Code of Federal Regulations, Part 310.

69.     Pursuant to the TSR, telemarketing "means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. 310.2(dd).

70.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," and defendants have initiated, or caused telemarketers to initiate, "outbound telephone call[s]" to consumers, including plaintiff, to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. §§ 310.2(v), (aa), (cc), and (dd).

71.     The TSR prohibits telemarketers and sellers from engaging in certain categories of deceptive conduct, including "[m]isrepresenting, directly or by implication, in the sale of goods or services... [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii). The TSR further prohibits, "[a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." 16 C.F.R. § 310.3(a)(2)(vi). A seller or telemarketer also violates the TSR by "[m]aking a false or misleading statement to induce any person to pay for goods or services." 16 C.F.R. § 310.3(a)(4).

72.     Defendants engaged in deceptive conduct prohibited under the TSR by making material misrepresentations concerning the efficacy of the advertising and media

relations services they purported to offer in order to induce plaintiff's agent for paying for such services, which in reality were merely a cover for an elaborate fraud.

73.     Additionally, defendants misrepresented the earnings potential that could be realized by advertising with WRN. The opportunity to advertise on WRN was an "investment opportunity" within the meaning of the TSR, which is defined as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(q).

74.     The TSR defines a prize promotion to include a "sweepstakes or other game of chance" or "[a]n oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize."

75.     It is also a prohibited deceptive practice under the TSR to fail "to disclose truthfully, in a clear and conspicuous manner," among other things, "that no purchase or payment is required to … participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate." 16 C.F.R. § 310.3(a)(l)(iv).

76.     Defendants engaged in deceptive conduct prohibited under the TSR by failing to disclose to plaintiff's agent that no purchase was necessary to participate in its lifetime achievement award prize promotion.

77.     Defendants' violations of the TCFAPA and the TSR caused the plaintiff economic loss in excess of $50,000.

78.     Prior to its filing this Complaint, plaintiff served a written copy of this pleading on the FTC as required by 15 U.S.C § 6104(b) and 16 C.F.R. § 310.7(b) as shown in Exhibit A.

## COUNT IV
Fraud under Pennsylvania Common Law

79.     Plaintiff realleges the above paragraphs as if fully restated herein.

80.     As set forth above, the defendants made false or misleading statements about the services which they allegedly provided and the benefits that would inure to Inn Dwelling from paying for those services.

81.     At the time that the defendants or defendants' agents made these false or misleading statements, defendants knew that the statements were false or misleading, or were reckless as to their truth or falsity, and acted with motive to induce plaintiff to pay for advertising and media relations services from the defendants, knowing that the plaintiff would rely on their statements, as it, in fact, did.

82.     Plaintiff has suffered damages from such misconduct in that, as a result of reliance on defendants' misrepresentations and omissions, plaintiff agreed to pay for advertising and media relations services from defendants. The actual extent to which defendants provided any service and the value of these purported services is negligible.

83.     Plaintiff would not have purchased the aforementioned services at all—let alone for the consideration and on the terms it actually did—if it had known that the defendants' activities and services had been falsely represented by the defendants' statements. Had the plaintiff known that the defendants had no capability or intention of providing the services and benefits they promised, plaintiff would not have authorized any financial transfers to defendants.

84.     Plaintiff suffered additional damage when defendants used plaintiff's

credit card and checking account numbers to make unauthorized withdrawals.

## COUNT V
Violations of Pennsylvania Unfair Trade Practices & Consumer Protection Law,
73 P.S. § 201-1, et seq.

85.     Plaintiff realleges the above paragraphs as if fully restated herein.

86.     Defendants intentionally and wrongfully presented deceptive, inaccurate,

false and misleading material information as to the service that it was selling.

87.     The defendants knew or reasonably should have known that plaintiff

would rely on their representations.

88.     The defendants have knowingly and willfully violated Pennsylvania's

Unfair Trade Practices and Consumer Protection Law, by engaging in deceptive acts or

practices as follows:

a.      Defendants did not disclose material facts in that they did not

disclose the true nature of the worthless product or service that they sold.  73 P.S. § 201-2(4)(v).

b.      Defendants have made fraudulent and deceptive statements

concerning the value of the product or service that they purported to sell, which statements

created a likelihood of confusion or misunderstanding on the part of Inn Dwelling.  73 P.S. §

201-2(4)(v).

89.     By reason of defendants' deceptive and misleading practices, plaintiff was

caused, and continues to suffer, economic loss.

90.     Plaintiff is entitled to treble damages and attorneys' fees as permitted by

73 P.S. § 201-9.2.

## COUNT VI
Breach of Contract

91.     Plaintiff realleges the above paragraphs as if fully restated herein.

92.     The defendants induced plaintiff to enter into a contract for the provision of advertising and  media relations services using immoral and illegal methods.

93.     The defendants have knowingly breached their agreement with plaintiff to provide advertising and media  relations services by failing to provide such services.

94.     Plaintiff performed all acts and obligations, and paid defendants $341,430, while only receiving negligible services, that were in actuality a cover for an elaborate fraud.

95.     Plaintiff has been damaged by the defendants' breach in an exact amount to be determined at trial.

## COUNT VII
Unjust Enrichment under Pennsylvania Common Law

96.     Plaintiff realleges the above paragraphs as if fully restated herein.

97.     To the detriment of plaintiff, the defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful collection of payments for the advertising and media  relations services that were not provided or were negligibly provided.

98.     Plaintiff was injured by the cumulative nature of the defendants' conduct. The cumulative effect of the defendants' conduct was to engage in a fraudulent scheme whereby Inn Dwelling's agent believed he was paying the defendants to provide advertising and media relations services with actual value, but instead, Inn Dwelling was victim to an unlawful telemarketing scheme in which defendants either provided no such services or provided services of no actual value.

99.     Thus, the defendants accepted and retained $341,430.00 from Inn

-20-

Dwelling, while providing little to no service in consideration of that benefit.

100.    Accordingly, plaintiff seeks full disgorgement and restitution of the defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

### COUNT VIII
Conversion under Pennsylvania Common Law

101.    Plaintiff realleges the above paragraphs as if fully restated herein.

102.    Defendants have converted to their own use, property belonging to plaintiff through unlawful acts and conduct. The specific sum of money that was converted is $341,430.00.

103.    Defendants knowingly and intentionally collected money through fraud and/or deception, specifically by promising that Inn Dwelling would receive money from defendants or WRN listeners while knowing that Inn Dwelling would never receive any money either from defendants or from WRN listeners.

104.    Defendants converted the plaintiff's property, specifically monies, and used this property for their own use.

105.    As a direct and proximate result of defendants' unlawful acts and conduct, Plaintiff was deprived of the use of its money that was unlawfully converted by defendants, and is thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by defendants to the date of judgment, compensatory damages (including overdraft fees) and punitive damages.

WHEREFORE, plaintiffs demand judgment against defendants in their favor and that they be given the following relief:

      a.     treble damages of $1,024,290.00 (representing three times the sum by which Inn Dwelling was defrauded, $341,4340), as authorized by RICO and the Pennsylvania UTPCPL, or in the alternative, direct damages of $341,430.00;

      b.     an award of pre- and post-judgment interest;

      c.     reasonable attorney's fees;

      d.     punitive damages; and

such other and further legal or equitable relief as this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiff demands a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: November 5, 2015

Respectfully submitted,

Richard J. Zack
Robert E. Fay
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
215.981.4000

-22-

# Exhibit A

# Pepper Hamilton LLP
#### Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

direct dial:  215.981.4149
direct fax:  800.748.7987
fayr@pepperlaw.com

November 4, 2015

Director Jessica L. Rich
Bureau of Consumer Protection
Federal Trade Commission
Washington, DC 20580

            Re:    Proposed Complaint Against Women's Radio Network, Inc.
                 and Associated Entities

Dear Director Rich:

        I represent Inn Dwelling, Inc., a Pennsylvania non-profit corporation that was defrauded out of more than $300,000 by Women's Radio Network, Inc. ("WRN") and related entities that purport to offer advertising on an internet radio station.  My colleague Rich Zack and I plan to file the enclosed complaint in the United States District Court for the Eastern District of Pennsylvania against these entities alleging, among other things, that they engaged in conduct that violated the Telemarketing and Consumer Fraud and Abuse Prevention Act and the FTC's Telemarketing Sales Rule.  I am providing prior notice of our filing in accordance with 15 U.S.C § 6104(b) and 16 C.F.R. § 310.7(b).

        Please note that Inn Dwelling alleges at paragraph 44 of the enclosed complaint that one of the individuals responsible for the conduct of WRN is Jeffrey Burton.  In 2000, the United States District Court for the Eastern District of New York entered a stipulated order of injunction against Burton prohibiting him from, inter alia, "Violating or assisting others in violating any provisions of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310 (as amended from time to time), including but not limited to: misrepresenting, directly or by implication '[a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability.' 16 C.F.R. § 310.3(a)(2)(vi)."  Copies of the complaint and stipulated order of injunction entered against Burton in that case are enclosed for your review.

| Philadelphia | Boston | Washington, D.C. | Los Angeles | New York | Pittsburgh |
| --- | --- | --- | --- | --- | --- |
| Detroit | Berwyn | Harrisburg | Orange County | Princeton | Silicon Valley | Wilmington |

www.pepperlaw.com

Pepper Hamilton LLP

Dir. Jessica L. Rich
Page 2
November 4, 2015

        Please do not hesitate to contact me if you have any questions concerning this impending litigation.

Respectfully submitted,

Robert E. Fay

REF:usd
Enclosure

cc:    Philip E. Hughes, Jr. (3936 Netherfield Road, Philadelphia, PA 19129)
       Richard J. Zack, Esq. (by email)
       Joseph Sullivan, Esq. (by email)